1
2
3
4
5
6
7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                 **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    KUWANNA PARTEE,                    No. CIV S-08-2411-CMK

12              Plaintiff,

13         vs.                           <u>MEMORANDUM OPINION AND ORDER</u>

14    COMMISSIONER OF SOCIAL
      SECURITY,
15
              Defendant.
16
      _____/
17

18              Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19    review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20    Pursuant to the written consent of all parties, this case is before the undersigned as the presiding

21    judge for all purposes, including entry of final judgment.  <u>See</u> 28 U.S.C. § 636(c).  Pending

22    before the court are plaintiff's motion for summary judgment (Doc. 17) and defendant's cross-

23    motion for summary judgment (Doc. 20).

24    / / /

25    / / /

26    / / /

                                        1

## I.  PROCEDURAL HISTORY

Plaintiff received social security benefits based on disability as a child.  In an October 30, 2000, application for benefits filed while plaintiff was a minor, plaintiff claimed disability began on September 1, 1999.  In her motion for summary judgment, plaintiff asserts that her disability results from borderline intellectual functioning and "an anxiety condition brought on by gunshot wounds in September 2000."  Eligibility was automatically redetermined upon plaintiff turning 18 and, on August 17, 2005, it was determined that plaintiff was no longer disabled as of April 23, 2005.   Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on April 16, 2007, before Administrative Law Judge ("ALJ") Mark C. Ramsey.  In a June 13, 2007, decision the ALJ concluded that plaintiff was no longer disabled as of April 23, 2005, based on the following relevant findings:

1.  As of April 23, 2005, the claimant has had the following severe impairments: borderline intellectual functioning and anxiety disorder;

2.  These impairments do not meet or medically equal an impairment listed in the regulations;

3.  As of April 23, 2005, the claimant has had the residual functional capacity for unlimited exertional activity with the ability to perform simple unskilled work without frequent public or fellow employee contact; and

4.  Considering the claimant's age, education, work experience, and residual functional capacity, as of April 23, 2005, the regulations establish that the claimant was able to perform a significant number of jobs in the national economy.

Plaintiff appealed and, on December 21, 2007, the Appeals Council issued a decision remanding for further proceedings before the ALJ.  In its decision, the Appeals Council stated:

The Administrative Law Judge found that, as of April 23, 2005, the claimant was no longer disabled.  In reaching this conclusion, the Administrative Law Judge found that the claimant has the residual functional capacity to perform work at all exertional limits.  The Administrative Law Judge also found that the claimant was limited to unskilled work without frequent public contact or frequent contact with fellow employees (Decision, page 5, Finding 5).  Vocational expert

testimony was not obtained.  However, given these significant non-exertional limitations, vocational expert evidence should have been obtained.  Therefore, a remand is necessary to obtain vocational expert evidence and determine whether jobs are available based on the limitations found.

A second hearing was held before the ALJ on March 14, 2008, at which time a vocational expert offered testimony.   In a June 24, 2008, decision, the ALJ again concluded that plaintiff was not disabled as of April 23, 2005.   After the Appeals Council declined further review on September 5, 2008, this appeal followed.

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence, summarized chronologically below.  Because plaintiff's motion for summary judgment only raises issues with respect to the ALJ's consideration of the various medical conclusions concerning plaintiff's mental health issues, the court need not summarize records relating to any other impairments.

November 2, 1999 – An "Assessment/Client Plan" form from Sacramento County Mental Health indicates that plaintiff had "off & on suicidal ideation."  The assessor indicated that one of plaintiff's strengths was that she "likes to help others, friendly."

March 29, 2001 – Stewart Teal, M.D., a child staff psychologist, completed an initial psychiatric evaluation.  Dr. Teal provided the following assessment:

On psychiatric interview Kuwana appeared as an attractive, slender fifteen-year-old African-American girl looking rather grim and with set facial expression.  She was able to relax as the interview proceeded and she was able to smile and engage with the interviewer in the assessment. Kuwana's logical associations of thought were intact and there was no indication of disorganization of logical thinking processes.  Her affect was appropriate to the content of her thought and her mood seemed mildly to moderately depressed through much of the interview.  Kuwana described a great deal of difficulty sleeping at night.  She has nightmares, which are repetitious of the shooting incident.  She also has associated nightmares in which other members of her family are shot who were not involved in that at all.  According to Kuwana she felt the problems with the anxiety particularly at night were getting better, but in the last month or two

months have again worsened and she continues to have difficulty.
Kuwana described anxiety symptoms of long standing when she is in
crowds.  She denied other kinds of anxiety except for fear of noises at
night in the dark, which have gotten much worse since the shooting.

* * *

Cognitively Kuwana seemed of average to low average intelligence.  She
was able to read at about sixth or seventh grade level, but had more
difficulty with understanding abstractions.  Some of her cognitive
difficulties may be secondary to her preoccupation with the shooting.  It
was hard for her to focus on things like memory test very well.  Her recent
memory was fairly good, remembering eight out of nine items after several
minutes.  Her interpretation of proverbs was clear and very concrete, but
there was no indication of any distortion of intrusive thoughts.  Kuwana
does some magical thinking believing in ghosts.  She also reports
occasionally hearing voices, which frighten her.  This is only rarely and
usually happens at night when she is trying to fall asleep.  Kuwana seems
to have a reasonably good conscience development with concerns for her
friends and for her family.

Dr. Teal offered the following conclusion and recommendation:

I see Kuwana as an anxious traumatized youngster struggling to deal with
her life following a major trauma.  She seems to have had difficulties both
with anxiety and behavior problems.  I would speculate that the shooting
exacerbated these problems and probably have resulted in the more severe
Post Traumatic Stress Disorder than otherwise would have occurred.
Kuwana was open and able to make a relationship with the interviewer.  I
would speculate that she could profit from individual psychotherapy as
well as family therapy.  In addition I feel her anxiety is such that a trial on
psychotropic medication is indicated.  She has been prescribed Paxil 20
mgs daily and Clonidine 0.1 mg at bedtime to help with agitation and
sleep.

April 2, 2001 – Barry N. Finkel, Ph.D., submitted a disability evaluation.  Dr.
Finkel reported the following on mental status observation:

Kuwana was seen individually for interview and testing.  She is alert and
is able to identify the year, month, and day of the week.  Speech is normal
in rate and flow.  She evidenced no difficulty understanding interview
questions or test instructions.  Thinking is logical and goal oriented.  She
denied delusions, hallucinations, or ideas of reference.  There is no
indication of psychotic symptoms.  Mood is dysphoric with appropriate
range of affect.  She looks sad but smiles often and seems to have
reasonable energy.

* * *

4

> She is able to recall five digits forward.  Social judgment is fair.  Asked about smoke and fire, she said "run out."  If she saw an envelope in the street that was sealed, addressed, and stamped?  "Put it in a mailbox."
>
> She put forth careful, deliberate effort on all test tasks and results are considered to be a valid measure of present functioning.  She was able to persist on all items without difficulty.

Dr. Finkel diagnosed post-traumatic stress disorder traits and borderline intellectual functioning.

He provided the following summary:

> This is a 15-year-old, African-American female who presents with a reported learning disability and depression.  Overall intellectual functioning is in the borderline range with no significant difference between verbal and performance scores.  On the WRAT-3, reading, spelling, and arithmetic skills are commensurate with IQ scores.  Specific learning disabilities are not indicated.  Results of the Vineland indicate daily living skills in the adequate range with communication and socialization in the moderately low range.
>
> The claimant is polite and cooperative, neatly dressed and groomed.  She presents well and her responses would suggest somewhat higher functioning that IQ scores alone would indicate.  She looks sad but smiles appropriately and describes the shooting in a matter-of-fact manner.  She indicates she is depressed and angry and verbalized what sounded like realistic concerns about additional violence.  She shows some PTSD traits.
>
> The claimant is able to groom and dress herself appropriately.  She should be able to follow simple instructions.  She would likely have difficulty attending to and following through on tasks without direct supervision due to cognitive limitations.  She is able to interact appropriately with others.  Attention, concentration, and pace are mildly to moderately impaired.  Her ability to manage an eight-hour day is likely moderately impaired.  If granted benefits, recommend re-evaluation in one year.  As a minor, she is not competent to manage funds.

April 4, 2005 – Agency examining psychologist David C. Richwerger prepared a report following a comprehensive psychiatric evaluation.  Plaintiff reported that "she sometimes hears dead loved ones such as her uncle and friend, and she has trouble sleeping."  She also stated she felt she could not trust others.  As to current level of functioning, Dr. Richwerger reported:

> The claimant lives in an apartment with her family.  The claimant states she does not sleep very well because the babies are crying often, and she only sleeps from about 3 a.m. to 6:30 a.m., and she has to take care of

infants.  The claimant states her appetite is reduced.  The claimant states she eats about twice a day because she breast feeds, and she states she usually does not eat that much.  The claimant states she does household chores and takes care of her children.  The claimant states she does not go anywhere because she does not feel safe.  The claimant states she has no outside activities or hobbies other than taking care of her kids.  The claimant states she handles her own financial affairs.  The claimant states she usually gets around by getting a ride.  The claimant is able to move about alone.  The claimant got a ride to this evaluation.  The claimant states she does not get along that well with her family.  The claimant states, "I feel my family does not like me."  The claimant states she has one friend that she interacts with.  The claimant states that on a daily basis she just takes care of her children.

Dr. Richwerger diagnosed borderline intellectual functioning and assigned a GAF score of 60. The doctor opined that plaintiff had no impairment in her ability to perform simple and repetitive tasks, her ability to perform work activities without special supervision, and her ability to maintain regular work attendance.  He felt plaintiff was slightly impaired in her ability to perform detailed and complex tasks,  her ability to perform work activities on a consistent basis, and her ability to understand and accept instructions from supervisors.  Dr. Richwerger stated that plaintiff was moderately impaired in her ability to complete a normal workday without interruption from a psychiatric condition, her ability to interact with co-workers and the public, and her ability to deal with the usual stresses encountered in competitive work.  The doctor stated that plaintiff was able to handle her own funds.

June 21, 2005 – Agency consultative psychiatrist Joseph Schnitzler, M.D., prepared mental residual functional capacity assessment.  The doctor opined that plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions. He did not find that plaintiff was significantly limited in any other area of mental functioning.

June 7, 2006 – Plaintiff reported to Dr. Curiale "no sleep at all."

July 14, 2006 – Dr. Curiale appears to have prescribed medication at this visit.

January 16, 2007 – Plaintiff reported to Dr. Curiale that she had just stopped smoking marijuana and cigarettes.

/ / /

1        February 2, 2007 – Treatment notes by Dr. Curiale indicate that plaintiff reported

2   feeling overwhelmed.

3        February 5, 2007 – Dr. Curiale prepared a letter addressed "To Whom it May

4   Concern" in which the doctor stated:

5               Kuwana Partee is suffering from Post Traumatic Stress due to
            being shot by random bullets shot by feuding neighbors.  She was an
6           innocent bystander.
                She is presently drug and alcohol free and is involved in outpatient
7           therapy.
                Kuwana is an excellent candidate for therapy and her prognosis is
8           excellent for success.

9        February 22, 2007 – Plaintiff reported to Dr. Curiale that she "continues to feel

10  depressed."  Plaintiff also reported that she was "feeling somewhat hopeless intermittently –

11  struggles to reduce anxiety constantly."

12       March 1, 2007 – Plaintiff reported to Dr. Curiale that she was sleeping "somewhat

13  better."  She told the doctor that she was happy and that her husband was clean and sober.

14  Plaintiff stated that, while her relationship is "somewhat stressful," she "is coping" and wants a

15  better life for her children.

16       April 10, 2007 – Dr. Curiale submitted a letter to plaintiff's attorney outlining her

17  opinions concerning plaintiff's mental functioning.  Dr. Curiale stated that she began treating

18  plaintiff in June 2006.  In her letter, Dr. Curiale outlined the results of psychological testing

19  administered in March 2007.  The doctor concluded:

20              . . . [Plaintiff] is unable to work in the general labor force at this
            time since she is unable to concentrate for any length of time.  She has
21          difficulty accepting authority and although attempts to be quite
            conforming would not be able to employ the judgment and thinking
22          necessary to be gainfully employed.

23  Dr. Curiale diagnosed post-traumatic stress disorder with generalized anxiety and assigned a

24  GAF score of 60.

25  / / /

26  / / /

1         July 19, 2007 – Dr. Curiale completed a "Medical Source Statement – Mental."

2    The form indicates that the last time plaintiff was treated by Dr. Curiale was on July 13, 2007.

3    The doctor opined that plaintiff's ability to understand and remember detailed or complex

4    instructions was poor and her ability to understand and remember very short and simple

5    instructions was somewhere between fair and poor.  Dr. Curiale stated that these limitations are

6    attributable to plaintiff's "confusion and inability to communicate for a sustained period of time."

7    Dr. Curiale also stated that plaintiff's ability to carry out instructions and work without

8    supervision were both poor as evidenced by "MMPI-2, Beck Depression Inventory, PTSD

9    Inventory."  The doctor opined that plaintiff's ability to interact with the public, co-workers, and

10   supervisors were all poor, but did not cite any objective medical findings to support this

11   conclusion.  Dr. Curiale stated that plaintiff's ability to adapt to changes in the workplace, ability

12   to be aware of hazards, and ability to use public transportation were also all poor, citing

13   "psychotherapeutic sessions."  Dr. Curiale's prognosis was "fair" and the doctor concluded that,

14   with time and therapy, plaintiff would "be able to re-enter a quasi-normal life."  Dr. Curiale

15   provided the following narrative with her source statement:

16        Ms. Partee has recurring images of being shot – she is in pain from
the bullets still being lodged in her body and that pain forces her to relive

17   her trauma and terror.  She is hypervigilent bordering often on paranoia
during our last session on 7-13-07.  She reported believing "someone was

18   in her room" and she "armed herself with a butcher knife to defend
herself."  She is highly irritable and "fights" with everybody.  She is often

19   teary and sad although she is taking Paxil and Depakote.  During the 4th of
July she hid in her room as the sounds of the fireworks sounded like

20   gunshots to her.  She was hospitalized after the shooting at Sierra Vista
Mental Hospital.  She was 15 yrs. old.  She attended outpatient services for

21   3 mos. and has asked for assistance intermittently over the years.

22        She appears to be genuinely interested in "getting better" however
presently she is disabled.

23   / / /

24   / / /

25   / / /

26   / / /

### III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

# IV.  DISCUSSION

In her motion for summary judgment, plaintiff argues: (1) the ALJ failed to properly credit the opinion of her treating mental health professional, Angela Curiale, Ph.D.; and (2) the ALJ failed to fulfill his duty to develop the record by obtaining additional clinical findings from Dr. Curiale.

## A.    **Evaluation of Medical Opinions**

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.  While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester, 81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

1  finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

2  legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

3  professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

4  without other evidence, is insufficient to reject the opinion of a treating or examining

5  professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

6  conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

7  1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

8  see also Magallanes, 881 F.2d at 751.

9  　　　　Regarding plaintiff's treating mental health professional – Dr. Curiale – the ALJ

10  stated as follows in the decision after rehearing:

11  　　　. . .The claimant began psychotherapy with Dr. Curiale in June 2006.  She
noted the claimant had a prior traumatic history.  The subsequent chart
12  notes indicate the claimant was seen by the psychologist on two occasions
in 2006 and on four occasions in early 2007.  However, the brief chart
13  notes record the claimant's various complaint but contain no clinical
findings.  (Ex 7F, 11F, 19F-21F).
14
The claimant's representative has submitted a new statement from Dr.
15  Curiale who again noted the claimant's prior trauma history and stated that
in July 2007 the claimant has hypervigilent and bordering on paranoia.
16  The claimant described being highly irritable and having "fights" with
everyone as well as feeling teary and sad.  Dr. Curiale concluded the
17  claimant has a fair ability to understand, remember, and carry out short and
simple instructions.  However, she found the claimant has a poor ability to
18  understand, remember, and carry out detailed or complex instructions;
work without supervision; interact with the public, coworkers, or
19  supervisors; adapt to changes in the workplace; be aware of normal
hazards; and ability to use public transportation to travel to unfamiliar
20  places.  However, the undersigned does not credit this assessment as Dr.
Curiale noted in April 2007 that the claimant had a GAF of 60 consistent
21  with only moderate limitations in function and there is no evidence to
support a finding that her condition deteriorated between April and July
22  2007.

23  In discrediting Dr. Curiale's opinion, the ALJ necessarily rejected the doctor's conclusion that

24  plaintiff could not perform work involving contact with supervisors.  The ALJ instead accepted

25  the conclusions of Drs. Finkel and Richwerger, neither of whom opined as to any limitation with

26  respect to supervisors.

1    Plaintiff argues that the ALJ erred in rejecting Dr. Curiale's opinion that plaintiff

2    was limited in her ability to work with supervisors.  Specifically, she argues:

3         The reasoning of the ALJ is faulty for the following reasons: First,
         the opinion of the treating doctor [Dr. Curiale] was based on clinical
4         testing and on repeated examinations of the plaintiff, not a short
         examination; second, the opinion of the consultative examiner was
5         actually very similar and differed only in degree on a limitation outdated.
         Finally, the opinion of the treating doctor is not controverted by clear and
6         convincing evidence to the contrary. [¶] The opinion of the treating doctor
         was based on regular examinations.  By the time of Dr. Curiale's
7         diagnosis, she had seen plaintiff on at least six occasions over 2006 and
         2007.  The opinion of the consultative examiner was based on a one-time
8         exam.

9                                    * * *

10        The Administrative Law Judge's conclusion that plaintiff had the
         residual functional capacity for unskilled work limited only by restrictions
11        on public and co-worker contact is not supported by substantial evidence.

12    The court does not find plaintiff's argument to be persuasive.  First, contrary to

13    plaintiff's assertion, Dr. Curiale's opinion as to contact with supervisors is contradicted in that no

14    other mental health professional expressed such an opinion.  In particular, while Dr. Richwerger

15    opined that plaintiff would have difficulty with contact with the public and co-workers, he

16    expressed no opinion concerning limitations on contact with supervisors and Dr. Finkel

17    specifically said that plaintiff would have no problems interacting appropriately with others.

18    Because Dr. Curiale's opinion in this regard is contradicted, the ALJ need only give specific and

19    legitimate reasons supported by the record for rejecting her opinion.

20        The ALJ gave the following reasons for discrediting Dr. Curiale's opinion:

21    (1) Dr. Curiale's opinion is based on brief chart notes which outline only subjective complaints;

22    (2) the opinion is not supported by clinical findings; and (3) the opinion is inconsistent with Dr.

23    Curiale's other findings.  The court finds that these reasons are specific, legitimate, and

24    supported by the record as a whole.  A review of Dr. Curiale's record reflects that she saw

25    plaintiff on June 7, 2006, July 14, 2006, January 16, 2007, February 2, 2007, February 22, 2007,

26    March 1, 2007, and July 13, 2007 (there are no chart notes for this last visit, which is referenced

in a medical source statement).  As summarized above, and as the ALJ noted, the chart notes for these visits indicates that plaintiff reported various subjective complaints.  The notes, however, do not outline any objective findings.  The question is not, as plaintiff characterizes it, whether Dr. Curiale treated plaintiff on a regular basis or for only a short period of time.  The question is whether Dr. Curiale's findings are supported by objective clinical findings.  Certainly the chart notes of the six or seven times Dr. Curiale treated plaintiff do not reflect such findings.

The only reference to any clinical testing by Dr. Curiale is in the doctor's July 19, 2007, medical source statement.  In this document, Dr. Curiale references the MMPI-2, Beck Depression Inventory, and PTSD Inventory.  The doctor did not, however, state which specific results of these tests supported any particular limitation.  Moreover, to the extent the Beck Depression Inventory and PTSD Inventory merely asked the plaintiff to list subjective symptoms, neither can be said to represent objective clinical findings.  There are no references to particular MMPI-2 data.  Finally, when asked what clinical findings support the doctor's conclusion that plaintiff could not interact with supervisors, Dr. Curiale did not outline any findings whatsoever.  And as to her opinion that plaintiff would have difficulty with changes in the workplace, awareness of hazards, and use of public transportation, Dr. Curiale referenced "psychotherapeutic sessions" but no specific clinical findings.

Based on the foregoing, the court finds that the ALJ's decision to reject Dr. Curiale's opinion concerning contact with supervisors is supported by proper legal analysis and the record as a whole.

### B.    Duty to Develop the Record

The ALJ has an independent duty to fully and fairly develop the record and assure that the claimant's interests are considered.  See Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).  When the claimant is not represented by counsel, this duty requires the ALJ to be especially diligent in seeking all relevant facts.  See id.  This requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts."  Cox v.

13

1  <u>Califano</u>, 587 F.2d 988, 991 (9th Cir. 1978).   Ambiguous evidence or the ALJ's own finding that

2  the record is inadequate triggers this duty.  <u>See</u>  <u>Tonapetyan</u>, 242 F.3d at 1150.  The ALJ may

3  discharge the duty to develop the record by subpoenaing the claimant's physicians, submitting

4  questions to the claimant's physicians, continuing the hearing, or keeping the record open after

5  the hearing to allow for supplementation of the record.  <u>See</u> <u>id.</u> (citing <u>Tidwell v. Apfel</u>, 161 F.3d

6  599, 602 (9th Cir. 1998)).

7  Plaintiff argues:

8  As noted above, the Administrative Law Judge rejected the opinion of the treating doctor Angela Curiale, Ph.D.  The ALJ stated that Dr.

9  Curiale's "brief chart notes record the claimant's various complaints but contain no clinical findings."

10  Dr. Curiale stated the results of the MMPI II and noted that her opinions were based on the MMPI II, the Beck Depression Inventory, and

11  the PTSD Inventory.  The ALJ was unclear about what he meant by clinical findings, if it was not encompassed in Dr. Curiale's report.  The

12  ALJ could have requested such further clinical findings by asking the plaintiff's attorney or sending a subpoena for the records.

13

14  This argument is also unpersuasive given that the ALJ's duty to develop the record was never

15  triggered in this case.  The evidence was not ambiguous or inadequate.  Instead, as the ALJ

16  found, clinical objective evidence to support Dr. Curiale's opinion simply did not exist.  If it had

17  existed, it was the plaintiff's duty to present the ALJ with such evidence.

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

14

1

## V. CONCLUSION

2       Based on the foregoing, the court concludes that the Commissioner's final

3  decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY

4  ORDERED that:

5            1.      Plaintiff's motion for summary judgment (Doc. 17) is denied;

6            2.      Defendant's cross-motion for summary judgment (Doc. 20) is granted; and

7            3.      The Clerk of the Court is directed to enter judgment and close this file.

8

9  DATED: March 24, 2010

10

11                                                      CRAIG M. KELLISON
                                                        UNITED STATES MAGISTRATE JUDGE
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26